# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal Action No.: 21-477 (RC) |
| | : | |
| BRYAN SPARKS, | : | Re Document Nos.: 17, 25, 30, 36, 37, 39 |
| | : | |
| Defendant, | : | |
| | : | |
| AUTUMN GAIL LUNA, | : | |
| | : | |
| Defendant. | : | |

## <u>MEMORANDUM OPINION</u>

**GRANTING DEFENDANT SPARKS'S MOTION TO SUPPRESS; GRANTING DEFENDANT LUNA'S MOTION TO SUPPRESS; GRANTING DEFENDANT LUNA'S MOTION TO ADOPT; GRANTING DEFENDANT SPARKS'S MOTION TO FILE A REPLY**

## I. INTRODUCTION

Co-defendants Bryan Sparks and Autumn Luna were traveling cross-country from Washington state to Florida by Amtrak when they passed through Washington, D.C. on June 22, 2021. They were stopped on the platform at Union Station by Amtrak Police Officer Brandt Bartman and his K9 dog, Koda, for a ticket check and then a canine sniff. When Koda alerted on Luna's purse, both defendants were handcuffed and taken to the Amtrak police substation. A subsequent search of their luggage and the statements they made lead to the present narcotics and controlled substance charges against them. Both defendants now seek to suppress those statements and that evidence on basis that the initial search and seizure was in violation of the Fourth Amendment. For the following reasons, the Court will grant the motions.

## II.  BACKGROUND

At the time of their arrest, Sparks and Luna were in the middle of a trip from Washington to Florida, where Sparks's father was undergoing chemotherapy treatment.  *See* United States' Resp. in Opp'n Def.'s Mot. Suppress ("Gov't 1st Opp'n") at 2, ECF No. 18; Mot. Suppress Statements & Supp. Mot. Suppress Tangible Evidence & Statements ("Defs.' Suppr. Mot.") at 1, ECF No. 25.  After a brief layover at Union Station on June 22, 2022, they were escorted from the lounge to their train by an Amtrak employee, *see* Defs.' Suppr. Mot. at 2; Tr. Dec. 2, 2021 Mot. Hearing ("12/2/21 Tr.") at 78:8–12, 79:8–13, ECF No. 34, who brought them nearly to the sleeper car and gestured to the entrance, *id.* at 88:7–12.  That employee testified that Sparks and Luna acted normally and followed his instructions.  *Id.* at 87:19–88:1.  His testimony was consistent with the surveillance footage, which shows Sparks and Luna walking behind the employee until nearly the entrance of the sleeper car.  *See* Def. Sparks Ex. 1 at 3:02–55.

Amtrak Police Officer Bartman was patrolling the platform at that time with Officer Fales.  United States' Opp'n Def.'s Mot. Suppress Statements and Suppl. Mot. Suppress Evidence ("Gov't 2d Opp'n") at 2, ECF No. 29.  Both were in full uniform and accompanied by Koda, a canine trained to sniff for narcotics.  *Id.*; 12/2/21 Tr. at 11:14–15, 16:23–25.  Officer Bartman testified that Sparks and Luna were on the platform too early and that passengers were still disembarking.  *Id.* at 17:2–7.  He claimed that he did not see the Amtrak employee escorting Sparks and Luna despite looking for one, *id.* at 42:17–21, and despite acknowledging that the surveillance footage showed the usher as being only about "six feet" away from him, *id.* at 65:1–20; *see also* Tr. Dec. 14, 2021 Mot. Hearing ("12/14/21 Tr.") at 65:6–10, ECF No. 35 (acknowledging that the footage shows the employee gesturing to the sleeper cars was "maybe a few feet" away from Officer Bartman).  Officer Bartman approached Sparks and Luna and asked

to see their tickets and ID.  12/2/21 Tr. at 17:5–7.  Luna initially kept walking, but Officer

Bartman "call[ed] her back" to conduct the ticket check.  12/14/21 Tr. at 66:3–5, 66:20–67:2.

Sparks first produced the bar code that Amtrak employees would use to scan the tickets, then

produced the full pdf ticket upon Officer Bartman's request, and both individuals provided their

identification.  12/2/21 Tr. at 45:15–46:25, 48:23–49:6.

Next, Officer Bartman allegedly asked Sparks and Luna whether they were carrying

contraband such as drugs, bombs, or large sums of money, *id.* at 18:5–12; 49:21–50:4; 52:15–18,

and they stated that they were not, 12/14/21 Tr. at 85:1–4.  Officer Bartman then instructed them

to place their bags on the ground for a canine sniff.  *Id.* at 86:8–10; *see also* 12/2/21 Tr. at 18:3–

4.  They complied, and the body worn camera footage shows Koda sniffing the luggage and

alerting on the purse that had been in Luna's possession.  12/14/21 Tr. at 5:9–6:21; Gov't Ex. 2A

at 00:12–43.  Following Koda's alert on the purse, Officer Bartman placed Luna in handcuffs

and at the same time directed his partner to handcuff Sparks.  12/14/21 Tr. at 7:8–14; Gov't Ex.

2B at 00:26–45.  After she was handcuffed and was told that she "may or may not get arrested"

"depending on what it is," Luna stated that she had "a pipe" and "maybe a gram of coke" in her

purse and asked whether that would get her arrested.  Gov't Ex. 2B at 2:04–57.  The timing of

that statement as shown on the video and acknowledged by Officer Bartman in his testimony

before this Court contradicted both Officer Bartman's affidavit and grand jury testimony in this

case, where he claimed that Luna had made the statement *before* he handcuffed her.  12/14/21

Tr. at 76:14–80:11.

While both defendants were handcuffed on the platform, Officer Bartman again directed

Koda to sniff the luggage, including moving some of the objects to allow her to smell better.

12/2/21 Tr. at 23:20–24:5; 12/14/21 Tr. at 9:11–14:23; Gov't Ex. 2C at 00:17–1:08.  Koda then

alerted on a jacket that Sparks had been carrying and which Luna immediately identified as hers. 12/2/21 Tr. at 24:6–15; 12/14/21 Tr. at 15:13–17:7.  The officers then took both defendants and the luggage to the Amtrak Police Office in Union Station, where they were put in separate rooms.  12/2/21 Tr. at 24:16–25:20.

Officer Bartman read Sparks his *Miranda* rights and asked him whether he wished to waive his rights and speak with them.[1]  *Id.* at 27:2–28:8.  Sparks initially asked if there was any way he could go see his father—explaining that his father was undergoing chemotherapy and Sparks was on his way to visit him.  12/14/21 Tr. at 26:17–28:5; Gov't Ex. 2D at 00:45–56. Officer Bartman insisted that Sparks give a yes-or-no answer regarding the *Miranda* waiver following another question from Sparks about whether it would help him get to see his father. 12/14/21 Tr. at 28: 3–5.  Sparks then said "OK, yes," after which Officer Bartman added, "It can. It can be a citation arrest. Or it can be a jail arrest. Depending on how much more stuff you guys got in your belongings."  *See* Gov't 2d Opp'n at 7 (quoting the conversation).  Sparks was subsequently asked for and gave consent to search his luggage, which he identified.  12/2/21 Tr. at 31:18–32:7; Gov't 2d Opp'n at 8–9.  The search of Sparks's bags uncovered the tangible evidence that he now seeks to suppress.  *Id.* at 9.

Defendant Sparks's first motion to suppress tangible evidence and statements in this case was followed by a second, more developed, motion.  *See* Mot. Suppress Tangible Evidence & Statements & Mem. P. & A. Supp. Thereof, ECF No. 17; Defs.' Suppr. Mot.  Both motions were joined by Defendant Luna, *see* Min. Order of Oct. 13, 2021 (granting leave to Luna to join Sparks' arguments), and Luna filed a separate related motion to suppress, *see* Autumn Luna's

---

[1] Luna was separately asked on video whether she understood her rights and wished to waive them and answered yes to both questions.  12/14/21 Tr. at 52:3–14; Gov't Ex. 6 at 1:05–33.

Mot. Suppress Evidence & Statements ("Luna Suppr. Mot."), ECF No. 30.  This Court held a

two-day hearing on the motions at which it heard testimony from Officer Bartman and a civilian

Amtrak employee.  *See* 12/2/21 Tr.; 12/14/21 Tr.  At the Court's request, the parties filed

supplemental briefing following those hearings.[2]  *See* Suppl. Bryan Sparks' Mot. Suppress

("Defs.' Suppl."), ECF No. 36; United States' Opp'n Def.'s Suppl. Mot. Suppress Evidence

("Gov't Suppl. Opp'n"), ECF No. 38; Def.'s Reply to Resp. to Suppl. Bryan Sparks's Mot.

Suppress ("Defs.' Suppl. Reply"), ECF No. 40.  In response to an inquiry from the Court, the

parties submitted further briefs on the issue of seizure.  *See* Def. Bryan Sparks' Resp. to Court's

Min. Order ("Sparks Resp."), ECF No. 42; United States' Suppl. Br. ("Gov't 1st Resp."), ECF

No. 43; Resp. to Court's Min. Order ("Luna Resp."), ECF No. 45; United States' Suppl. Br.

("Gov't 2d Resp."), ECF No. 46.  The matter is now thoroughly briefed and ripe for resolution.

### III.  LEGAL STANDARD

The Fourth Amendment guarantees the "right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.

Violations of this guarantee are generally subject to the exclusionary rule, which requires courts

to suppress evidence obtained through unconstitutional means.  *See, e.g.*, *United States v.*

*Weaver*, 808 F.3d 26, 33 (D.C. Cir. 2015) (citing *Mapp v. Ohio*, 367 U.S. 643, 655 (1961);

*Weeks v. United States*, 232 U.S. 383, 398 (1914)).  This exclusion of evidence includes both

"the primary evidence obtained as a direct result of an illegal search or seizure and . . . evidence

---

[2] Luna filed a motion to join Sparks' supplemental arguments, Def. Autumn Luna's Mot. Adopt, ECF No. 37, which the Court will grant in the interests of judicial efficiency.  Sparks additionally sought leave to file a Reply to the Government's opposition to his supplement.  Mot. Leave File Reply, ECF No. 39.  Finding the proposed reply helpful to the Court's resolution of this matter, the Court will likewise grant that motion and deem the proposed reply filed.

later discovered and found to be derivative of an illegality, the so-called fruit of the poisonous tree." *Utah v. Strieff*, 579 U.S. 232, 237 (2016) (internal quotations omitted).

The defendant bears the threshold "burden of proving whether and when the Fourth Amendment was implicated." *United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994); *see also United States v. Delaney*, 955 F.3d 1077, 1081 (D.C. Cir. 2020) ("The person challenging the seizure bears the burden of demonstrating that he was seized." (quotations omitted)). If a search or seizure within the meaning of the Fourth Amendment occurred without a warrant, "the burden is on the government to demonstrate that its conduct was reasonable for purposes of the Fourth Amendment." *United States v. Johnson*, 365 F. Supp. 3d 89, 99 (D.D.C. 2019). Otherwise, "the proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *United States v. Gibson*, 366 F. Supp. 3d 14, 19 (D.D.C. 2018) (quoting *Rakas v. Illinois*, 439 U.S. 128, 130 n.1, 99 (1978)). "When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given," which "cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 548–49 (1968).

## IV. ANALYSIS

In order to assess the constitutionality of the stop and subsequent canine sniff of the defendants' belongings, the Court must evaluate each stage of this interaction with precision: the initial stop, the security questions, the request to place the luggage on the ground for a security check, and the canine sniff. For each stage, "the first issue is whether" the officers' conduct "amounts to a 'seizure' or 'detention' implicating the Fourth Amendment." *United States v. Nurse*, 916 F.2d 20, 22 (D.C. Cir. 1990). If the Court "determine[s] that there has been a

detention or seizure, the next question is whether the action was supported by a constitutionally appropriate quantum of evidence." *Id.*

### A. Initial Ticket Check and Security Questions

The Court finds no constitutional infirmity with the first portion of the interaction between Officer Bartman and the Defendants—the ticket check. "[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions" and "[t]he encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). Sparks and Luna may have felt that they could not leave, but the standard is an objective one. *See id.* at 434 ("So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required." (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991) (internal citation omitted)). It is well-settled "that an encounter between a police officer and a citizen, involving no more than approach, questioning, and official identification, does not constitute a seizure and does not require probable cause, articulable suspicion, or any other kind of objective justification." *United States v. Smith*, 901 F.2d 1116, 1118 (D.C. Cir. 1990) (internal quotation marks omitted); *see also Nurse*, 916 F.2d at 23 (holding that no reasonable suspicion is required for an officer to approach an individual and ask questions); *United States v. Lloyd*, 868 F.2d 447, 451 (D.C. Cir. 1989) ("[A]n officer's request for travel tickets, identification, or other information does not become a 'seizure' merely because the officer does not tell the person that he may refuse to answer the questions and is free to leave.").

Defendants point to the security questions posed by Officer Bartman as a separate step without thoroughly developing that argument. *See* Defs.' Suppl. at 9 n.3; Defs.' Suppl. Reply at 1. Although in some instances the totality of the circumstances surrounding police questioning

may cause initially "consensual questioning" to "ripen[] into an investigative detention," *United States v. Sterling*, 909 F.2d 1078, 1083 (7th Cir. 1990), the Court does not find that the security questions here passed that threshold. This portion of the interaction lasted only a few seconds, the officers had returned Defendants' phone and identification after examining them, and the train was not about to imminently depart. *See United States v. Mendenhall*, 446 U.S. 544, 558 (1980) ("The respondent had been questioned only briefly, and her ticket and identification were returned to her before she was asked to accompany the officers."); *United States v. Winston*, 892 F.2d 112, 117 (D.C. Cir. 1989) (determining that a reasonable person would have felt free to leave where, "[o]nly two officers were involved, both of them in plain clothes[, t]heir weapons were concealed, and at no time did they physically or verbally threaten, or intimidate, or even touch the defendant before his arrest").

Accordingly, the initial encounter and questioning was consensual and outside the scope of the Fourth Amendment. The next question is whether, under the totality of the circumstances, the initial encounter ripened into a seizure at the point when Sparks and Luna were told to put their belongings on the ground and step away for a canine sniff.[3]

### B. Seizure of Luggage

#### 1. Whether Fourth Amendment Rights were Implicated

The next question is whether the separation of Defendants' belongings from their persons for the purpose of a canine sniff was a "seizure" that implicated the Fourth Amendment. The

---

[3] Because the initial encounter and questioning was not a seizure within the meaning of the Fourth Amendment, the Court need not consider the Government's argument that Defendants consented to the ticket check through the Amtrak terms of service, which require passengers to provide tickets and valid identification to law enforcement officers upon request. *See* Gov't 1st Opp'n at 6 (citing Terms of Transportation, Random Ticket/ID Checks, https://www.amtrak.com/terms-and-conditions.html#termsOfTransportation-carriageOfPassengers).

primary precedent is *United States v. Place*, in which the Supreme Court applied the principles of *Terry v. Ohio*—which allows a brief stop of a person on the basis of reasonable suspicion alone—to the seizure of property, specifically, "warrantless seizures of personal luggage from the custody of the owner . . . for the purpose of pursuing a limited course of investigation, short of opening the luggage, that would quickly confirm or dispel the authorities' suspicion." 462 U.S. 696, 702 (1983). *Place* held that when the agents separated the defendant from his luggage, a seizure occurred for Fourth Amendment purposes. *Id.* at 707 ("There is no doubt that the agents made a 'seizure' of Place's luggage for purposes of the Fourth Amendment when, following his refusal to consent to a search, the agent told Place that he was going to take the luggage . . . ."). The same principles apply here.

The Court first notes that the seizure of the luggage and the seizure of the Defendants are separate questions. "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 554. In contrast, "[a] 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). "[S]eizures, unlike searches, involve an interference with *possessory*—not privacy—interests." *United States v. Miller*, 799 F.3d 1097, 1101 (D.C. Cir. 2015) (emphasis in original).

In situations such as this one, a person's luggage may have been "seized" within the meaning of the Fourth Amendment even if a reasonable person would have otherwise felt free to leave. *Lloyd*, 868 F.2d at 451 (holding that a defendant was not "seized" during an otherwise voluntary search when he in fact "walked away while [the officer] searched his bag"); *United States v. Tavolacci*, 704 F. Supp. 246, 250 (D.D.C. 1988), *aff'd*, 895 F.2d 1423 (D.C. Cir. 1990)

(noting "the overlap of an individual's own liberty interest and his possessory interest in his luggage such that the police might be inclined to detain an individual, for whom the officers no longer have any questions, while securing a dog to conduct a sniff of his luggage").[4]  But either type of seizure, whether of the person or the property, must be reasonable in order to comport with the Fourth Amendment.  *See Place*, 462 U.S. at 708 ("The precise type of detention we confront here is seizure of personal luggage from the immediate possession of the suspect for the purpose of arranging exposure to a narcotics detection dog.  Particularly in the case of detention of luggage within the traveler's immediate possession, the police conduct intrudes on both the suspect's possessory interest in his luggage as well as his liberty interest in proceeding with his itinerary.").  The D.C. Circuit applied this principal in *Nurse*, in which an officer first decided to detain the defendant's bag for a canine sniff and told her she was free to go, and only detained the defendant after she attempted to leave with the bag anyway.  916 F.2d at 23–24 (D.C. Cir. 1990).  The Circuit held that "[a]lthough the detentions of Nurse and the bag are temporally separate events, the same quantum of suspicion is constitutionally required."  *Id.* at 24.

    As the Supreme Court also recognized in *Place*, the seizure of luggage may also have the practical result of preventing an individual from leaving, therefore amounting to a seizure of their person as well.  *See* 462 U.S. at 708 (noting that seizure of luggage "can effectively restrain the person since he is subjected to the possible disruption of his travel plans in order to remain with his luggage or to arrange for its return").  This is particularly true for Luna, who was

---

[4] The Government's discussion of *United States v. Lea*, 839 Fed. App'x 551 (D.C. Cir. 2020), is inapposite.  *Lea* discusses the objective standard for whether a seizure of a person occurred but did not involve a seizure of property.  *Id.* at 553.  And in any event, the Circuit held that the officers in *Lea* had reasonable, articulable suspicion of criminal activity at the moment they approached the defendant because they saw him smoking a hand-rolled cigarette and smelled marijuana.  *Id.* at 554.

separated from her purse, which contained her identification needed for further travel. *See* Luna Suppr. Mot. at 3–4. The Court need not reach this question, however. Even if a reasonable, law-abiding individual in Sparks's and Luna's position would have felt free to leave without their luggage, at least some "quantum of suspicion [was] constitutionally required" to detain their luggage alone. *Nurse*, 916 F.2d at 24.

Neither the Court nor the parties in their numerous rounds of briefing have identified a case on all fours with this one. On one end of the spectrum, there is ample caselaw that a canine sniff that does not interfere with an individual's personal use and control over their belongings— such as when the luggage is checked or the sniff takes place outside of the owner's presence— does not violate the owner's possessory or privacy interests. *See United States v. Colyer*, 878 F.2d 469, 477 (D.C. Cir. 1989) (the sniff occurred outside of a private compartment of a sleeper car from a public corridor and the defendant was not aware that the sniff was taking place); *United States v. Beale*, 736 F.2d 1289, 1291 (9th Cir. 1984) (a sniff of luggage "located in a baggage area" where the defendant was not himself detained or even present); *United States v. Goldstein*, 635 F.2d 356, 361-62 (5th Cir. 1981) (a sniff of two checked bags that the defendants had already released to airline custody); *United States v. Germosen-Garcia*, 712 F. Supp. 862, 866-67 (D. Kan. 1989) (a sniff of checked bags that were in the custody of the airline and had not been taken "from the immediate possession of the defendants").

On the other end of the spectrum, when an officer physically takes and detains someone's belongings without consent for the purpose of a canine sniff, those items have been "seized." *See Miller*, 799 F.3d at 1102 ("[S]ubjecting luggage to a canine sniff does not amount to a search under the Fourth Amendment because it infringes no constitutionally protected privacy interest . . . . [b]ut detaining luggage to facilitate a canine sniff is no doubt a seizure for purposes of the Fourth Amendment because it intrudes on the owner's possessory interest in the luggage."

(cleaned up)); *United States v. Frost*, 999 F.2d 737, 740 (3d Cir. 1993) ("It is established that when a police officer or other law enforcement officer takes a piece of luggage from a person, a 'seizure' within the meaning of the Fourth Amendment occurs."); *Carhee*, 27 F.3d at 1497 (holding that the initial approach and questioning of the defendant by drug interdiction officers was not a seizure, but agreeing with the defendant that even "if he was not seized initially . . . the Fourth Amendment was 'surely' implicated when the officers took his briefcase"); *United States v. McCarthur*, 6 F.3d 1270, 1276 (7th Cir. 1993) (holding that a consensual encounter on a train platform "developed into an investigatory stop, and thus a Fourth Amendment seizure, when [the officer] told [the defendant] that her tote bag would be detained for a canine sniff"); *Tavolacci*, 704 F. Supp. at 248, 250 (ordering defendant to exit the train with his suitcase to conduct a canine sniff on the platform required reasonable suspicion); *United States v. Carrazco-Escalante*, 300 F. Supp. 2d 1155, 1164 (D.N.M. 2004) (finding "that a seizure occurred when [the officer] took Defendant's jacket in order to expose it in a clothing lineup to a narcotics detection dog"); *United States v. Joffre*, 894 F.2d 403 (4th Cir. 1989) (unpublished table decision) (finding that there was reasonable suspicion to temporarily detain the defendant and subject his luggage to a canine sniff).

The Government argues that what occurred here is closer to the "checked luggage" cases because "Officer Bartman neither physically took, nor stated his intention to detain, Defendants' luggage;" rather, he instructed them to place it a few feet away on the ground. Gov't 1st Resp. at 3–4. But an officer need not use physical force or explicitly state an intention to detain the luggage for a seizure to occur. It is settled law that a seizure of a person occurs "when the officer, by means of physical force *or show of authority*, has in some way restrained the liberty of a citizen." *Terry*, 392 U.S. 1, 20 n.16 (1968) (emphasis added); *see also Mendenhall*, 446 U.S. at 554 (using

an objective, totality-of-the-circumstances test to evaluate whether a seizure of the person occurred). So too with the seizure of luggage—meaningful interference with an individual's possessory interest in a piece of property may be accomplished by a show of authority rather than brute force. *Cf. Bostick*, 501 U.S. at 434–35 ("We have stated that even when officers have no basis for suspecting a particular individual, they may . . . request consent to search his or her luggage—as long as the police do not convey a message that compliance with their requests is required." (cleaned up)). An officer's expression of intent to detain the luggage or use of physical force is certainly relevant, but not necessary, to determining whether a seizure occurred.

Nor was Officer Bartman's action akin to "an officer merely pick[ing] up an individual's property to look at it." Gov't 1st Resp. at 3 (citing *Arizona v. Hicks*, 480 U.S. 321, 324, (1987)). The fact that Koda could have sniffed the luggage if it had been checked or left on the platform is irrelevant, because that is not what happened. *See id.*; *see also Beale*, 736 F.2d at 1291–92 (checked luggage in the baggage area); *Goldstein*, 635 F.2d at 361-62 (checked bags that the defendants had already released to airline custody). Sparks and Luna had not voluntarily surrendered their luggage to a third party such as Amtrak or left it unattended on the platform. Rather, those items had been in Defendants' immediate possession up until they were instructed to place their belongings on the ground and would have remained in their possession absent the instruction from Officer Bartman. When the Defendants placed their suitcases, jacket, laptop bag, and purse on the ground, they were temporarily deprived of the ability to access those items and anything in them. In addition, they were told to step away from their bags while Officer Bartman and Koda conducted the sniff, effectively foreclosing their use and control over their belongings.

The Government also argues that because Officer Bartman could have permissibly followed Sparks and Luna "into their roomette" to conduct the sniff or "led Koda to sniff luggage that passengers held in their hands or on their shoulders," Officer Bartman's actions here must have been reasonable.  *See* Gov't 1st Resp. at 4.  Setting aside the question of whether such techniques are in fact analogous to this one, the Court doubts that the relevant precedent extends so far.  The sniff in *Colyer* occurred outside of the private train roomette from the public corridor and did not involve any interference with possessory interests at all, *Colyer*, 878 F.2d at 472, a much different situation than an officer following an individual "into their roomette" without consent or reasonable suspicion.  And there appears to be, at best, a split of authority on whether a canine sniff of a person[5] is a search within the meaning of the Fourth Amendment.  *See Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 477–479 (5th Cir. 1982) (holding that a canine sniff of school lockers and unattended cars was not a search, but that sniffs of student's persons was a search); *Doe v. Renfrow*, 451 U.S. 1022, 1026–27 (1981) (Brennan, J., dissenting from the denial of certiorari) (expressing "astonish[ment] that the court did not find that the school's use of the dogs [to sniff the student's person] constituted an invasion of petitioner's reasonable expectation of privacy.").

## 2.  Consent

Of course, it is settled law that "even when officers have no basis for suspecting a particular individual, they may generally . . . request consent to search his or her luggage—as

---

[5] To the extent that a canine sniff of items in a person's hands or immediate possession may be different from a canine sniff of the person, the cases cited by the Government do not draw such a distinction.  *See* Gov't 1st Resp. at 4; *see also Doe v. Renfrow*, 631 F.2d 91, 94 (7th Cir. 1980) (Swygert, J., dissenting) ("The cases . . . holding that sniffing dogs do not constitute a search are totally inapposite because in those cases the dogs were sniffing inanimate *and unattended* objects rather than people." (emphasis added)).

long as the police do not convey a message that compliance with their requests is required."
*Bostick*, 501 U.S. at 434–35 (cleaned up).  Thus, if Defendants consented to placing their bags on
the ground in response to a request from Officer Bartman, no seizure would have occurred.  The
Court therefore pauses to address the Government's argument that Sparks and Luna gave implied
consent to the seizure and search of their belongings.  Gov't Suppl. Opp'n at 5.  "It is well
established that police, even in the absence of probable cause, may conduct a warrantless search
pursuant to voluntary consent."  *United States v. Joseph*, 892 F.2d 118, 122 (D.C. Cir. 1989).
Consent must be voluntarily given and must be judged by an objective standard "taking into
account all of the circumstances surrounding the encounter."  *Bostick*, 501 U.S. at 437–38.

The government bears "the burden of proving that the consent was, in fact, freely and
voluntarily given" when attempting to justify a warrantless search on the basis of consent, and
that burden "cannot be discharged by showing no more than acquiescence to a claim of lawful
authority."  *Bumper*, 391 U.S. at 548–49.  The government likewise bears the burden of showing
consent to a seizure.  *See Judd v. United States*, 190 F.2d 649, 650–51 (D.C. Cir. 1951) ("[A
defendant] may give his consent to the search and seizure.  But such a waiver or consent must be
proved by clear and positive testimony, and it must be established that there was no duress or
coercion, actual or implied.").  Here, the Government has not met its burden of showing that
Sparks and Luna voluntarily consented to the seizure of their luggage.

Officer Bartman testified that he did not remember the exact language he used to tell
Sparks and Luna to place their bags on the ground, and no body-worn camera footage of that
crucial moment exists because neither officer had yet turned on their camera at that point.
12/2/21 Tr. at 49:12–20 ("Q. Do you remember the exact words you used?  A. I do not . . . . Q.
And the reason why we don't have the exact words is because you hadn't activated your body-

worn camera at that time.  Right?  A. Right.").  His testimony inconsistently characterized the instruction, at times describing it as a request and other times as an order.  *Compare id.* at 18:3–4 ("I asked the -- both individuals if they could put their bags on the ground so my K9 can conduct a sniff.") *and id.* at 49:8–9 ("[I] asked if they'd mind putting their bags on the ground so my K9 can conduct a sniff.") *with* 12/14/21 Tr. at 83:5–6 ("[D]uring the security scan, I said, 'You guys can put your bags on the ground.'") *and id.* at 83:7–9 ("Q. In other words, this wasn't a request, could you please?  It was put your bags on the ground; correct?  A. Yeah. Correct.").

What Officer Bartman clearly remembered what he did *not* say, which was to tell Sparks and Luna that they were free to leave or could refuse consent to the search.  *See* 12/2/21 Tr. at 47:14–16 ("Q. You didn't tell them they were free to go at that point.  Right?  A. No.  I didn't state those words.").  Such a warning is not necessary for voluntary consent, but the lack of one is a relevant factor to be considered in the totality of the circumstances.  *See Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973) ("While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent."); *see also United States v. Baskin*, 886 F.2d 383, 386 (D.C. Cir. 1989).It is also notable that the Government relies on *implied* consent rather than *express* consent because there was no evidence presented that either Sparks or Luna affirmatively agreed to the seizure of their luggage.  At no point in Officer Bartman's testimony did he recall or mention an affirmative statement from either Sparks or Luna, describing only the fact that they had complied.  *See, e.g.*, 12/2/21 Tr. at 67:25 ("I asked him if he'd mind, and they put it down.").  That difference is a stark contrast from cases that have found defendants to unambiguously have consented to a search in similar contexts.  For example, law enforcement officers questioned the defendant in *Winston* as he was getting off a bus, explained that they were looking for drugs, and

asked if they could search his bag—to which the defendant answered "No, I don't mind, because I don't have anything to do with drugs." *United States v. Winston*, 892 F.2d 112, 114 (D.C. Cir. 1989). In *Baskin*—one of the cases the Government relies on—the officers had testified that the defendant said "sure, I don't mind" when asked for consent to the sniff, accompanied the officer to where the dog was, and responded "you can look in there yourself if you want" when asked whether he was carrying narcotics. *Baskin*¸ 886 F.2d at 385; *see also Joseph*, 892 F.2d at 122 (finding that consent to a search was voluntary "when plain clothes officers courteously requested and received permission before conducting a luggage search"); *United States v. Battista*, 876 F.2d 201, 203 (D.C. Cir. 1989) (holding that defendant gave valid consent to a search by saying, "sure," and again confirming, "That's okay," after being told he could refuse); *United States v. Roget*, 127 F. App'x 505, 506 (D.C. Cir. 2005) (finding valid consent to search a private train compartment where the officer asked, "Can I search your room?" and the defendant said, "Okay").

Although whether consent was freely and voluntarily given is an objective standard, it is relevant that Officer Bartman subjectively did not believe that Sparks and Luna were free to leave—particularly in light of the absence of audio recording of this moment. Officer Bartman had already called Luna back once when she continued walking as he initiated the ticket check, saying "Ma'am, come back." 12/14/21 Tr. at 67:24. And he admitted in his testimony that he would have continued questioning the Defendants had they attempted to leave. *See* 12/2/21 Tr. at 47:23–25 ("Q. They weren't free to go. If they just ignored you and walked off, you would continue to ask them questions. Right? A. Yes."). Consent is not voluntary if it is "granted only in submission to a claim of lawful authority." *Schneckloth*, 412 U.S. at 233. As in the context of determining whether a seizure occurred, "[f]actors considered in assessing whether an officer's

actions amounted to a show of authority include," among others, "whether the officer's use of language or tone of voice indicated that compliance with the officer's request might be compelled." *United States v. Castle*, 825 F.3d 625, 632–33 (D.C. Cir. 2016) (internal quotations omitted). In light of these considerations, and the overall inconsistency of Officer Bartman's testimony, the Court considers it highly likely that Officer Bartman's instruction was phrased in a way that amounted to a show of authority and "convey[ed] a message that compliance [was] required." *See Bostick*, 501 U.S. at 437.[6]

Finally, the Government points to a clause of the terms of service allowing Amtrak to refuse carriage to passengers who do not consent to inspections of their persons or baggage. Gov't 1st Opp'n at 9, n.3 (citing Terms of Transportation, Random Ticket/ID Checks, https://www.amtrak.com/terms-and-conditions.html#termsOfTransportation-carriageOfPassengers); Gov't 2d. Opp'n at 10. The Government cites no authority suggesting that passengers waive their Fourth Amendment right of protection from unreasonable search and seizure altogether by choosing to take some kind of public transportation, and a similar argument was soundly rejected by then-Judge Sotomayor of the Second Circuit in *United States v. $557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66 (2d Cir. 2002). As she concisely put it, "the mere fact that airline passengers know that they must subject their personal effects to reasonable security searches does not mean that they are automatically consenting to *un*reasonable ones. Otherwise, the government could eliminate Fourth Amendment protections altogether merely by announcing its intentions beforehand." *Id.* at 81 (emphasis in original).

---

[6] Although not relied on by the parties, Officer Bartman's grand jury testimony further bolsters this version of events, as he testified that Luna at first declined to place her bags on the ground. Def. Sparks Ex. 5 at 14:7–10 ("Ms. Luna didn't at first. She did not put her purse onto the ground, and I asked her to put her purse onto the ground. She was very hesitant, but she eventually complied.").

This reasoning likewise distinguishes this seizure from other security programs in airports and other transportation centers that the Government cites. *See* Gov't 1st Opp'n at 8 (collecting cases); *see, e.g.*, *MacWade v. Kelly*, 460 F.3d 260, 263–65 (2d Cir. 2006) (upholding a random search program at subway stops where participation was voluntary and officers had "virtually no discretion in determining whom to search"); *United States v. Marquez*, 410 F.3d 612, 614, 618 (9th Cir. 2005), *amended*, No. 04-30243, 2005 WL 1661572 (9th Cir. July 18, 2005) (upholding additional airport security screening based on "completely random selection" for the limited purpose of identifying explosives and emphasizing passengers' ability to avoid search by deciding not to travel). And as those cases also suggest, there is an important difference between the ability to refuse carriage, as the terms state that Amtrak may do, and the ability to compel compliance with a search or seizure of luggage. *See* Terms of Transportation, Carriage of Passengers, https://www.amtrak.com/terms-and-conditions.html#termsOf Transportation-carriageOfPassengers ("Amtrak may refuse to carry passengers . . . [w]ho refuse to consent to Amtrak security inspections of persons and/or baggage . . . ."). The Government's argument seeks to conflate the two.

To summarize, Sparks and Luna were not told that they could refuse, Luna had already been summoned back once, Officer Bartman subjectively believed that they were not free to leave, there is no evidence that either defendant responded at all rather than simply complying, and the only testimony on whether the instruction was phrased as a request or an order was inconsistent. The only credible evidence that the Government offers in support of its argument that the Defendants voluntarily consented to the seizure is the fact that they complied. That is simply not enough. *See Bumper*, 391 U.S. at 548–49 (holding that the government cannot establish the voluntariness of consent to a search "by showing no more than acquiescence to a

claim of lawful authority"). The Court therefore finds that the Government has not satisfied its burden of showing voluntary consent to the seizure of Defendants' luggage.

### 3. Whether there was Reasonable Articulable Suspicion

Still, a non-consensual seizure of luggage such as occurred here may still be justified on less than probable cause. "When the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests, the opposing law enforcement interests can support a seizure based on less than probable cause." *Place*, 462 U.S. at 703. Because the seizure and canine sniff were minimally intrusive and limited in scope, it required only reasonable, articulable suspicion. *See Nurse*, 916 F.2d at 23–24.

"The government bears the burden to provide evidence sufficient to support reasonable suspicion." *Delaney*, 955 F.3d at 1081 (quotations omitted). Reasonable suspicion under *Place* must be based "on specific articulable facts that the property contains contraband or evidence of a crime." *Place*, 462 U.S. at 706. The existence of reasonable suspicion is an objective standard. *Terry*, 392 U.S. at 21–22. A court should credit "the specific reasonable inferences" an officer "is entitled to draw from the facts in light of [their] experience," but an "inchoate and unparticularized suspicion or 'hunch'" will not suffice. *Id.* at 27. Sparks and Luna argue that the officers did not have reasonable suspicion, and the Court agrees.

Officer Bartman testified over two different days on this motion, as well as completing a sworn affidavit and providing testimony to the grand jury. Significant parts of that testimony were internally inconsistent as well as in conflict with the video evidence. First, Officer Bartman's testimony about why he chose to initiate the encounter was inconsistent. He initially stated that Sparks and Luna were present on the platform before the authorized time for boarding, while passengers were still disembarking the train. *See, e.g.*, Affidavit Supp. Crim.

Compl. ¶ 6, ECF No. 2-1; 12/2/21 Tr. at 17:2–5 ("As passengers were disembarking the train, I observed two individuals walking towards me from the station that had their luggage with them, and at that point in given time there's no boarding announcements yet for train 91.").  But that version of events was contradicted by the testimony of the Amtrak employee, who confidently testified that he had escorted Sparks and Luna from the lounge to the sleeper car only after he had determined and announced that the platform was clear.  *See* 12/2/21 Tr. at 76:13–78:12; *see also id.* at 90:13–20 ("[I]s there any doubt in your mind that the train had already arrived and all the passengers coming off of that train had already gone into the terminal?  A. Yes, sir.  Train's already disembarked, and after I put them on, I was ready to do general boarding.  Q. And how sure are you of that?  A. Positive.").  Officer Bartman testified that he "didn't see" an Amtrak employee accompanying the Defendants despite looking for one, 12/2/21 Tr. at 42:17–21, an improbable statement given the video footage, which shows the employee escorting the Defendants within a few feet of Officer Bartman, Def. Sparks Ex. 1 at 3:51–58.

    In addition to claiming that Sparks and Luna were on the platform too early, Officer Bartman also stated that they aroused his suspicions while they walked toward him by "staring straight ahead with no eye contact" as they approached.  12/2/21 Tr. at 44:14–15.  The Court declines to credit this statement, which was inconsistent with earlier portions of Officer Bartman's testimony, *id.* at 42:23–43:2 ("[O]ther than . . . their presence on the platform at this time, did you have any other reason why you were suspicious of Mr. Sparks and Ms. Luna?  A. No."), and was inconsistent with the Amtrak employee's testimony that Sparks and Luna "were acting normal," *id.* at 87:21.  It also did not appear in Officer Bartman's *Gerstein* Affidavit, search warrant affidavit, affidavit in support of the criminal complaint, or grand jury testimony.  *See generally* Affidavit Supp. Crim. Compl.; Def. Sparks Exs. 3–5.  Finally, it strikes the Court

as unlikely that Officer Bartman was able to observe Defendants' manner of walking and eye contact without also noticing the Amtrak employee walking with them.  And even if the Court did choose to credit that statement, staring straight ahead and not making eye contact is not an especially unusual way to walk down a train platform.  *Cf. Delaney*, 955 F.3d at 1087 ("'Nervous, evasive behavior is,' of course, 'a pertinent factor in determining reasonable suspicion.'  But not all reactions to seeing the police are suggestive of criminal behavior." (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)) (cleaned up)).

Similarly, Officer Bartman stated that when he asked for the Defendants' tickets, Sparks's "hands were shaking."  12/14/21 Tr. at 69:8.  The surveillance footage is too distant to either confirm or dispel that statement, but it is worth noting that it did not appear in Officer Bartman's affidavit.  *See* 12/14/21 Tr. at 19:1– 20:10 (confirming on cross-examination that neither the Affidavit of Probable Cause nor *Gerstein* Affidavit mentioned shaking hands).  And it was inconsistent with earlier testimony from Officer Bartman, as well.  12/2/21 Tr. at 46:20–22 (asking whether, while Sparks produced the requested ticket, "there was nothing else that drew your suspicions, right?  Nothing new.  A. No.").  Finally, from the point that the body worn camera footage begins—while Koda is sniffing the luggage—it does not appear that Sparks was shaking or otherwise nervous; in fact, the video shows him rather nonchalantly eating a bag of chips as the canine sniff takes place.  Gov't Ex. 2A at 00:26–44.  Although common sense would suggest that a suspect would become more, rather than less, nervous as an encounter progresses, Officer Bartman conceded that none of the nervous behaviors he described are captured on the

video and had only occurred before he activated his body-worn camera.  12/14/21 Tr. at 23:16-24:3.  Accordingly, the Court declines to credit that statement, either.[7]

In all other respects, nothing objectively suspicious occurred during the course of the ticket check.  Although Sparks initially produced a scannable bar code rather than the pdf reservation, Officer Bartman conceded that there was "nothing suspicious" about that.  12/2/21 Tr. at 46:2–4.  After being asked for the full pdf reservation, Sparks promptly produced a valid ticket for the train they had been about to board, and Sparks and Luna both provided valid identification that matched their travel reservation.  *Id.* at 49:1–5; *cf. Colyer*, 878 F.2d at 479 (a one-way, cash-purchase ticket from a "source city" was suspicious); *Nurse*, 916 F.2d at 24 ("production of a dubious means of identification" was suspicious); *United States v. Carrasquillo*, 877 F.2d 73, 75 (D.C. Cir. 1989) (identification not matching reservation was suspicious).  And although the Government suggests in its briefing that traveling across the country by train, which it describes as "the least-convenient way possible," would be suspicious, Gov't 1st Opp'n at 8, Officer Bartman did not actually testify that the Defendants' travel itinerary was suspicious based on his training or expertise or even that it struck him as unusual in any way.

To the contrary, Officer Bartman described the stop as "random," which he defined as "just because."  12/2/21 Tr. at 50:20–24 ("[W]hat does 'random' mean to you?  A. Random is just a stop -- just because?  I don't know.  It's just a random stop.  Q. Stop just because you think you should stop them.  A. Yeah.").  An "inchoate and unparticularized suspicion or 'hunch'" does not give rise to reasonable suspicion, *Terry*, 392 U.S. at 27, nor does an unsystematic

---

[7] Although the Court declines to credit certain statements by Officer Bartman, it clarifies that it is not making a blanket adverse credibility finding as to his testimony in all respects.

decision to conduct a search or seizure "just because."  Random detentions that permit "standardless and unconstrained discretion" cannot be squared with the Fourth Amendment.  *See Delaware v. Prouse*, 440 U.S. 648, 650–51, 661 (1979) (rejecting an officer's discretionary traffic "spot check" in which he pulled over a car at random without any suspicion of a traffic violation or any standardized procedure).

The Court takes care to note that it is not holding that factors such as nervous behavior, an unusual reservation, or presence on the platform at an incorrect time could never give rise to a reasonable suspicion, whether in combination or alongside other factors.  It only finds as a factual matter, based on the evidence presented and its own observation of the witnesses and the video, that those factors were not actually present here.  Because there were no credible, objective, articulable facts that would have given Officer Bartman reasonable suspicion for the detention of the luggage either before the ticket check or while it unfolded, Officer Bartman lacked the necessary reasonable suspicion to temporarily seize Defendants' luggage for the purpose of conducting a canine sniff.

### 4.  Reasonableness

Finally, the Government argues in its final supplemental brief that to the extent a seizure occurred, it was so minimal an interference that it was nonetheless reasonable under the Fourth Amendment.  Gov't 2d Resp. at 2; *see also* Gov't 1st Resp. at 3–4 (suggesting that the interaction was so minimally intrusive that it did not reach the level of a "meaningful interference" with Defendant's possessory interest in their luggage).  In the primary case relied on by the Government, *Gordon*, an officer responding to a domestic violence call temporarily seized a handgun, maintained control of the handgun even after the Defendant was transported to the police station, and learned a few minutes later that the handgun was contraband because the

Defendant was a felon who was not permitted to possess one. *United States v. Gordon*, 741 F.3d 64, 71–72 (10th Cir. 2014). The Tenth Circuit determined that the seizure, although improperly extended, was nonetheless reasonable because the Defendant "was improperly deprived of his property for only a few minutes—the elapsed time between locking the house and discovering Gordon was a convicted felon—and while he was legitimately in custody." *Id.* at 73. The Tenth Circuit determined that at least on "the unique facts" of the case, the "*de minimis* violation of [the] defendant's property rights [did not] make [the] seizure constitutionally unreasonable . . . particularly when suppression is highly unlikely to deter improper police behavior[.]" *Id.* at 68. Similarly, in *Jacobsen* the Supreme Court acknowledged that some intrusions on property interests are *de minimis* but held that the action at issue—testing a trace amount of a substance to determine if it was contraband—was reasonable when balancing its *de minimis* nature with the compelling need to test an already lawfully-detained substance officers suspected was contraband. 466 U.S. at 125; *see also Beale*, 736 F.2d at 1292 (describing "[a]ny interference with Beale's possession of his luggage," which was in the checked baggage area, as "*de minimis*").

For the reasons already described, the involuntary separation of Sparks and Luna from their luggage was meaningfully more significant than the testing of a trace amount of contraband in *Jacobsen* or the improperly extended seizure of a handgun from a defendant in custody in *Gordon*. To be sure, the inconvenience and intrusion of momentarily placing bags on the ground is minimal. But it is not so minimal that no quantum of suspicion is required at all. For instance, in *Place* the Court held that an officer could "detain the luggage briefly to investigate the circumstances that aroused [the officer's] suspicion" based only on reasonable suspicion. *Place*, 462 U.S. at 706. But it also determined that the 90-minute detention of the luggage to facilitate

the canine sniff in fact exceeded the limits of what reasonable suspicion could justify, and that probable cause was required. *Id.* at 709–10 ("[T]he detention of respondent's luggage in this case went beyond the narrow authority possessed by police to detain briefly luggage reasonably suspected to contain narcotics."). In other words, the lesser inconvenience and delay of the kind of seizure that occurred in this case is already reflected in the lower *Terry-Place* standard of reasonable suspicion.

Although there is a clear governmental interest in apprehending narcotics, there are any number of ways that law enforcement can and does legitimately further that interest. For instance, a brief detention such as this one would be perfectly reasonable if supported by reasonable suspicion. Or it would likely be permissible if conducted pursuant to a truly random program of security checks in which the officer's discretion is constrained. *MacWade*, 460 F.3d at 263–65 (upholding a random search program at subway stops where participation was voluntary and officers had "virtually no discretion in determining whom to search"). Nor does anything prevent Amtrak police officers from requesting and receiving consent to sniff luggage in similar circumstances. Particularly in light of these valid alternatives, the Government's justification for conducting the search in this exact manner is uncompelling.

And unlike in *Gordon*, suppression here does have remedial value. As the Supreme Court held when rejecting the constitutionality of discretionary traffic "spot checks" conducted without suspicion or standardized procedure, "standardless and unconstrained discretion is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed." *See Prouse*, 440 U.S. at 661. "To insist neither upon an appropriate factual basis for suspicion directed at a particular automobile nor upon some other substantial and objective standard or rule to govern the exercise of discretion 'would invite

intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches . . . .'" *Id.* (quoting *Terry*, 392 U.S. at 22). The Court will not condone discretionary, suspicion-less seizures merely because they are brief.

### C. Suppression and Fruit of the Poisonous Tree

Having concluded that a Fourth Amendment violation occurred, the Court's only remaining task is to determine what evidence is subject to the exclusionary rule. The exclusionary rule applies to both the primary evidence obtained directly from the illegal search and the evidence subsequently obtained that is "derivative of [the] illegality." *Strieff*, 579 U.S. at 237 (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)). "An illegal search or seizure calls for suppression of evidence only if the seizure is a but-for cause of the discovery of the evidence (a necessary condition), and if the causal chain has not become too attenuated to justify exclusion, or, to put the same point with another metaphor, if circumstances have not purged the evidence of the primary taint." *United States v. Brodie*, 742 F.3d 1058, 1062–63 (D.C. Cir. 2014) (cleaned up).

The illegal seizure of the luggage was undoubtedly the but-for cause that set off the subsequent chain of events. Absent the seizure, no canine sniff would have taken place and no probable cause to detain either defendant would have arisen.[8] The Government does not argue otherwise, nor does it advance any argument about whether the subsequent statements from both defendants and their consent to the later search were otherwise purged of the taint of the illegal seizure. Because it has not, and because the burden is on the prosecution to show that subsequent statements were not "obtained by exploitation of an illegal arrest," *Brown v. Illinois*,

---

[8] The Court need not reach the separate question of whether there was probable cause to detain Sparks in light of the fact that Koda had only alerted to Luna's purse at the time he was handcuffed.

422 U.S. 590, 603–04 (1975), the Court will not consider any such argument here.  Accordingly, the physical evidence discovered in Defendants' bags and the statements they made once in custody must all be suppressed as the fruit of the poisonous tree.

## V.  CONCLUSION

For the foregoing reasons, Defendant Sparks's Motion to Suppress Statements and Evidence (ECF No. 17) and Supplemental Motion to Suppress (ECF No. 25) are GRANTED; Defendant Luna's Motion to Suppress (ECF No. 30) is GRANTED; Defendant Luna's Motion to Adopt (ECF No. 37) is GRANTED; and Defendant Sparks's Motion to File a Reply (ECF No. 39) is GRANTED.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 19, 2022                                        RUDOLPH CONTRERAS
                                                             United States District Judge